# Presidential Succession and Delegation in Case of Disability

[The following memorandum discusses issues relating to presidential succession and dele-
gation of presidential power in the event of a temporary disability of the President. It
examines the mechanism established by the Twenty-Fifth Amendment by which the
Vice President assumes the powers and duties of the Office of the President, and the
conditions under which the President resumes his Office after his disability is ended. It
also examines the circumstances in which the President may delegate his powers to
other officials, including the Vice President, when it is not considered necessary or
appropriate to invoke the provisions of the Twenty-Fifth Amendment. It concludes
that functions vested in the President by the Constitution are generally not delegable
and must be performed by him; however, any power vested in the President by statute
may be delegated to subordinate officers, unless the statute affirmatively prohibits such
delegation. Finally, the memorandum briefly reviews the form and method of delega-
tion. An appendix contains a historical summary of prior presidential disabilities and the
resulting effect on presidential authority.]

April 3, 1981

## MEMORANDUM FOR THE ATTORNEY GENERAL

As a result of the recent assassination attempt on President Reagan,
this Office has researched several issues that relate to presidential suc-
cession and the delegation of presidential power in the event of a
temporary disability of the President. This memorandum sets forth our
conclusions on the relevant legal issues.

### I. Presidential Succession

The Twenty-Fifth Amendment to the U.S. Constitution establishes a
mechanism for presidential succession in the event that the President
becomes unable to perform his constitutional duties. Succession may
take place in two ways. First, if the President is able and willing to do
so, he may provide for the temporary assumption of the powers and
duties of his office by the Vice President by "transmit[ting] to the
President pro tempore of the Senate and the Speaker of the House of
Representatives his written declaration that he is unable to discharge
the powers and duties of his office." U.S. Const., Amend. XXV, § 3.
When the President transmits such a declaration, his powers and duties
devolve upon the Vice President as Acting President[1] until the Presi-

---

[1] There appears to be no requirement that the Vice President resign from his position as Vice
President or take the President's oath of office to serve as "Acting President." As a general rule, an
Continued

91

dent transmits an additional written declaration stating that he has become able to perform his responsibilities.

Second, if the President is unable or unwilling to transmit a declaration of his inability to perform his duties, the Vice President will become Acting President [2] if the Vice President and a majority of the "principal officers of the executive departments" transmit to the President pro tempore of the Senate and the Speaker of the House a written declaration that the President is unable to discharge the powers and duties of this Office. *See* U.S. Const., Amend. XXV, § 4. The term "principal officers of the executive departments" is intended to mean "the Cabinet," although the term "Cabinet" has no precise legal definition.[3]

If, during the period in which the Vice President is Acting President, pursuant to the provisions of Section 4 of the Twenty-Fifth Amendment, the President submits to the President pro tempore of the Senate and the Speaker of the House a written declaration that no inability exists, he will resume the powers of his office *unless,* within four days, the Vice President and a majority of the Cabinet heads transmit an additional written declaration stating that the President is unable to discharge his powers and duties. At that point, Congress must decide the

---

official who is "acting" in a certain capacity need not vacate the office previously held or take the oath of office ordinarily taken by the person whose duties he has temporarily assumed This conclusion is supported by *Presidential Inability and Vacancies in the Office of Vice President: Hearings Before the Subcomm. on Constitutional Amendments of the Senate Comm. on the Judiciary,* 88th Cong., 2d Sess 215, 232 (1965); *Presidential Inability: Hearings Before the House Comm. on the Judiciary,* 89th Cong., 1st Sess 87 (1965). *See also* J. Feerick, The Twenty-Fifth Amendment, 199 (1976) (Feerick) The rule as to resignation and/or taking the President's oath appears to be different for those officials further down the line of succession *See* 3 U.S.C. § 19. This memorandum does not address the issues involved in the devolution of powers beyond the position of Vice President.

[2] The Vice President will evidently continue to exercise the duties of Vice President while he serves as Acting President. The Vice President would, however, lose his title as President of the Senate. *See* 111 Cong. Rec. 3270 (1965) (Sen. Saltonstall); Feerick at 199

[3] *See* S. Rep. No. 66, 89th Cong., 1st Sess. 2 (1966) We believe that the "principal officers of the executive departments," for purposes of the Twenty-Fifth Amendment, include the Secretary of State, Secretary of Treasury, Secretary of Defense, Attorney General, Secretary of the Interior, Secretary of Agriculture, Secretary of Commerce, Secretary of Labor, Secretary of Health and Human Services, Secretary of Housing and Urban Development, Secretary of Transportation, Secretary of Energy, and Secretary of Education. That conclusion is supported by the legislative history *See* 111 Cong. Rec. 7938 (1965) (Rep. Waggoner); *id.* at 7941 (Rep Poff); *id.* at 7944–45 (Rep. Whitener); *id.* at 7953, 7954 (Rep. Gilbert). *See also* Feerick at 202–03; 5 U S.C. § 101. As a practical matter, and in order to avoid any doubt regarding the sufficiency of any given declaration, it would be desirable to obtain the assent of a sufficient number of officials to satisfy any definition of the term "principal officers of the executive departments."

There is some indication that acting heads of departments may participate in the presidential disability determination. Although the legislative history is conflicting, the House Judiciary Committee's report supports this conclusion, *see* H R. Rep No. 203, 89th Cong., 1st Sess. 3 (1965), as do the Senate debates, *see* 111 Cong. Rec. 15,380 (1965) (Sen. Kennedy); *id.* at 15,583 (1965) (Sen. Javits); and a leading commentator on the Amendment reaches the same conclusion. *See* Feerick at 203. *Contra,* 111 Cong Rec. 3284 (1965) (Rep. Hart). The contrary view proceeds on the assumption that such a decision should be made only by persons whom the President personally selected for his Cabinet. Such persons are presumably intimately familiar with the President and are of relatively equal status with the other decisionmakers.

92

issue within specified time limits. *See* U.S. Const., Amend. XXV, § 4, para. 2.[4]

## II. Presidential Delegation

Under circumstances in which it is not considered necessary or appropriate to invoke the provisions of the Twenty-Fifth Amendment, it may nonetheless be desirable for the President to delegate certain powers to other officials, including the Vice President. Under statute, 3 U.S.C. § 301, and under the Constitution, *see Myers* v. *United States,* 272 U.S. 52, 117 (1926), the President has broad authority to delegate functions vested in him by law. At the same time, the Constitution and certain statutory provisions impose limits on the President's power to confer his authority on subordinate officials. The nature and extent of those limits are considered in this section.

*A. Constitutional Limitations on the President's Power to Delegate His Functions*

As early as 1855, Attorney General Cushing articulated the general rule that the functions vested in the President by the Constitution are not delegable and must be performed by him. 7 Op. Att'y Gen. 453, 464–65 (1855). The Attorney General opined:

> Thus it may be presumed that he, the man discharging the presidential office, and he alone, grants reprieves and pardons for offenses against the United States, not another man, the Attorney General or anybody else, by delegation of the President.
>
> So he, and he alone, is the supreme commander-in-chief of the Army and Navy of the United States, and of the militia of the several States, when called into the actual service of the United States. That is a power constitutionally inherent in the person of the President. No act of

---

[4] Under the Amendment, we believe that there is no requirement that the requisite written declarations of disability be personally signed by the Vice President and a majority of the heads of executive departments. The only requirements are that their assent to the declaration be established in a reliable fashion and that they direct that their names be added to the document. Moreover, the Vice President and the Cabinet heads may send separate declarations if necessary. *See Presidential Inability: Hearings Before the House Comm. on the Judiciary,* 89th Cong., 1st Sess 79–80 (1965). Finally, we believe that under both §§ 3 and 4 of the Amendment, the transfer of authority to the Vice President takes effect "immediately" when the declaration is transmitted or sent, and is not delayed until receipt of the document by the President pro tempore of the Senate and the Speaker of the House. Although the question is not free from doubt, the language and the history of the Amendment tend to support this conclusion. *See* S. Rep. No 66, 89th Cong., 1st Sess. 12–13 (1965); H.R. Rep. No 203, 89th Cong., 1st Sess. 13 (1965). *But see* H.R. Rep. No. 564, 89th Cong., 1st Sess. 3 (statement of Managers on the Part of the House to the effect that "after *receipt* of the President's written declaration of his inability . . . such powers and duties would then be discharged by the Vice President as Acting President") The better construction would allow the devolution of powers "immediately" (the word used in § 4 of the Twenty-Fifth Amendment) upon transmittal No meaningful purpose would be served by awaiting the arrival of the document. The alternative construction allows a more rapid transition of presidential power when the national interests require it.

Congress, no act even of the President himself, can, by constitutional possibility, authorize or create any military officer not subordinate to the President.

So he appoints and removes ambassadors and other officers of the United States, in the cases and with the qualifications indicated by the Constitution.

So he approves or disapproves of bills which have passed both Houses of Congress: that is a personal act of the President, like the vote of a Senator or a Representative in Congress, not capable of performance by a Head of Department or any other person.

A study prepared by this Office in the 1950s reaches the same conclusions. This study and our research suggest that the following are nondelegable functions of the President:

1. The power to nominate and appoint the officers of the United States to the extent provided in Article II, § 2, clause 2 of the Constitution.

2. The power to approve or return legislation pursuant to Article I, § 7, clauses 2 and 3, and the power to call Congress into special session or to adjourn it according to Article II, § 3.

3. The power to make treaties by and with the advice and consent of the Senate. U.S. Const., Art. II, § 2, cl. 2. It should be noted, however, that the power to negotiate treaties and the power to enter into executive agreements may be delegated. *See* 7 Op. Att'y Gen., *supra,* at 465.

4. The power to grant pardons. U.S. Const. Art. II, § 2, cl. 1.

5. The power to remove purely executive presidential appointees. This power is vested in the President as an incident of his appointment power. *Myers* v. *United States,* 272 U.S. at 119.

6. The power to issue executive orders. Only the President can issue formal executive orders and proclamations. He can, however, delegate the power to issue many orders which cover substantially the same subject matter as executive orders and proclamations as long as they are not so named.

7. The powers of the President as Commander-in-Chief of the Army and Navy. U.S. Const., Art. II, § 2, cl. 1. In view of Article I, § 8, clauses 12 and 13, which state that Congress shall have the power to raise and support

the Army and to provide and maintain a Navy, many of the President's powers as Commander-in-Chief are statutory in part. To conclude that the President may not delegate his ultimate constitutional responsibilities as Commander-in-Chief is not to suggest that he is the only officer of the government who may make military decisions in time of emergency, when immediate response may be necessary. The President may make formal or informal arrangements with his civilian and military subordinates, in order to ensure that the chain of command will function swiftly and effectively in time of crisis. Of course, every military officer must be subordinate to the President.

## B. Statutory Limitations on the President's Power to Delegate His Functions

The foregoing discussion sets forth the general rule that the President may not delegate inherent powers that are conferred on him by the Constitution. On the other hand, he may generally delegate powers that have been conferred on him by Congress. Congress has so provided in 3 U.S.C. § 301, which states:

The President of the United States is authorized to designate and empower the head of any department or agency in the executive branch, or any official thereof who is required to be appointed by and with the advice and consent of the Senate, to perform without approval, ratification, or other action by the President (1) any function which is vested in the President by law, or (2) any function which such officer is required or authorized by law to perform only with or subject to the approval, ratification, or other action of the President: *Provided,* That nothing contained herein shall relieve the President of his responsibility in office for the acts of any such head or other official designated by him to perform such functions. Such designation and authorization shall be in writing, shall be published in the Federal Register, shall be subject to such terms, conditions, and limitations as the President may deem advisable, and shall be revocable at any time by the President in whole or in part.

Congress has further provided, in 3 U.S.C. § 302, that:

The authority conferred by this chapter shall apply to any function vested in the President by law if such law

95

does not affirmatively prohibit delegation of the performance of such function as herein provided for, or specifically designate the officer or officers to whom it may be delegated. This chapter shall not be deemed to limit or derogate from any existing or inherent right of the President to delegate the performance of functions vested in him by law, and nothing herein shall be deemed to require express authorization in any case in which such an official would be presumed in law to have acted by authority or direction of the President.

As a result of these statutes, the President is authorized to delegate any power vested in him by statute unless the statute "affirmatively prohibit[s] delegation." In our view, a statute should be construed as an "affirmative" prohibition of delegation only if it prohibits delegation expressly or by unmistakable implication. The purpose of §§ 301 and 302 is to facilitate the functioning of the Executive by specifically authorizing delegation in the great majority of cases. To this end, § 301 states a general rule in favor of delegation. In light of the breadth of this general rule, the exception in § 302 should be narrowly construed. The same inference can be drawn from the fact that Congress took care in § 302 not to derogate from any "existing or inherent right of the President to delegate the performance of functions vested in him by law."

Statutes which do expressly or by unmistakable implication prohibit delegation are subject to the possible constitutional objection that the power to delegate is inherent in the Executive and may not be restricted by Congress. The issue is a difficult one and has never been resolved in court. In our view, the wiser course is to comply with any clear congressional intention to prohibit delegation, in order to avoid testing the limits of this constitutional question, unless circumstances imperatively require delegation.

In the brief time we have had to review the matter, we have discovered only a very few statutes that expressly or by unmistakable implication prohibit delegation. What follows is a description of categories of statutes that fall or may fall within this general class.

1. Statutes Explicitly Prohibiting Delegation

The clearest cases are those in which the statute explicitly prohibits delegation. An example is found in the Export Administration Act of 1979, 50 U.S.C. § 2403(e) (Supp. III 1979), which provides that:

The President may delegate the power, authority, and discretion conferred upon him by this Act to such departments, agencies, or officials of the Government as he may consider appropriate, except that no authority under this

Act may be delegated to, or exercised by, any official of any department or agency the head of which is not appointed by the President, by and with the advice and consent of the Senate. The President may not delegate or transfer his power, authority, and discretion to overrule or modify any recommendation or decision made by the Secretary [of Commerce], the Secretary of Defense, or the Secretary of State pursuant to the provisions of this Act.

## 2. Statutes Conferring Nondelegable Functions

An unmistakable congressional intent to prohibit delegation may also be inferred from statutes that impose on the President a duty or power to exercise a nondelegable function. For example, it is commonly thought that only the President may issue an executive order or proclamation. Statutes that authorize the President to take an action, but require him to act by way of executive order or proclamation, can therefore be read as precluding delegation. An example is found in 22 U.S.C. § 441(a):

Whenever the President . . . shall find that there exists a state of war between foreign states, and that it is necessary to promote the security or preserve the peace of the United States or to protect the lives of citizens of the United States, the President shall issue a proclamation naming the states involved; and he shall, from time to time by proclamation, name other states as and when they become involved in the war.

## 3. Statutes Implicitly Prohibiting Delegation

A broad range of statutes confer powers on the President but do not state in terms or in the legislative history whether those powers are delegable. In some instances, the character or importance of the powers in question, or other special circumstances, may constitute a sufficient indication of a legislative intent to prohibit delegation.

In the brief time available, we have been unable to reach any firm conclusions regarding particular statutes in this category. In general, it would appear that statutory powers that have been exercised by the President himself on a consistent and longstanding basis are more likely than others to be held nondelegable. An example might be the President's statutory power to enter into or terminate trade agreements with certain nations under 19 U.S.C. § 1351.

97

A second special circumstance that can give rise to an inference of nondelegability occurs when Congress gives authority to an agency but subjects that authority to a requirement of presidential approval. In this circumstance, it can be argued that a delegation of the President's approval authority back to the agency would subvert the evident legislative intent to assure review by someone outside the agency, while a delegation to anyone else would conflict with the congressional intent to centralize primary administrative responsibility in the agency. For an example of such a statute, *see* § 12(k) of the Securities Exchange Act of 1934, 15 U.S.C. § 78l(k).[5]

### III. Delegable Functions

All remaining functions of the President may be delegated to subordinate officers. Many statutes explicitly authorize delegation. *See, e.g.,* 22 U.S.C. § 2381 (delegation of certain foreign affairs powers). In the absence of specific authorization, the general delegation statute, 3 U.S.C. §§ 301, 302, explicitly authorizes delegation except where precluded by statute. It is beyond the scope of this memorandum to describe the full extent of the presidential powers and responsibilities that may be delegated.[6] In general, powers which may be delegated include those of approval, authorization, and assignment; powers to establish and convene certain administrative commissions, to designate responsible officers, and to make certain factual determinations; powers to direct that certain actions be taken, to fix compensation of officers, to prescribe certain rules and regulations, and to make recommendations or reports.

It bears repetition that the President may not delegate his power to delegate his own functions. This is, in our view, a function that is constitutionally vested in the President personally. The President may delegate his powers if he is capable of a conscious decision to do so. If, however, he is incapable of such a decision, delegation cannot occur. If such a situation continues for a substantial period of time, it would appear desirable to initiate procedures for presidential succession under the Twenty-Fifth Amendment.[7]

---

[5] We emphasize that the above examples are entirely tentative; it may well be that, upon further examination of the statutes and their legislative histories, this Office would conclude that Congress did not intend to prohibit delegation.

[6] For a description of the President's general authority, see President's Advisory Council on Executive Organization, The Powers and Responsibilities of the President (1970).

[7] It might be possible for the President to delegate his powers contingent upon the occurrence of a specified event such as a certification by the President's personal physician that the President is temporarily incapable of making a conscious decision. We would emphasize, however, that this procedure should not be used if its effect is contrary to the intent of the procedures for presidential succession contained in the Twenty-Fifth Amendment.

## IV. Form and Method of Delegation

Whenever a presidential function or power is delegable, it may be delegated to the head of any department or agency in the Executive Branch, or any official thereof, if the official is appointed with the advice and consent of the Senate. 3 U.S.C. § 301. By statute, such a delegation is ordinarily accomplished through the preparation and publication of a written order or memorandum. The relevant document is normally signed by the President personally; but there is no express statutory requirement to that effect. In our opinion, the relevant statutory requirements are satisfied as long as the President actually makes the delegation in question and causes an appropriate written memorial to be prepared and published. He need not sign the document by his own hand. *See United States* v. *Fletcher,* 148 U.S. 84–92 (1893); 7 Op. Att'y Gen. at 472–73 (1855); 22 Op. Att'y Gen. 82, 84 (1898). Moreover, the statute does not purport to restrict the President's constitutional power to delegate his powers and functions. 3 U.S.C. § 302. We believe that a President may determine in an exigent circumstance that it is necessary to delegate a power or function without immediate compliance with the normal formal requisites (i.e., publication of a written document). Such a delegation is effective if it is necessary to enable the President to discharge his constitutional duty.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

Attachment

# APPENDIX

## PRIOR PRESIDENTIAL DISABILITIES

This is a summary of prior presidential disabilities and the resulting effect on presidential authority.[1]

1. James Madison suffered from a severe fever in the summer of 1813 in the midst of disputes with Congress on how to pay for the War of 1812. I. Brant, James Madison: Commander-in-Chief, 1812-1836, at 184-94 (1961). Daniel Webster reported at one point that Madison was too weak to read resolutions brought to his bedside. *Id.* at 186-87. Both Houses of Congress became "engrossed" for over a month in speculation on the succession,[2] since the Vice President was aged and there was a vacancy in the position of President pro tempore of the Senate. J. Feerick, The Twenty-Fifth Amendment 4-5 (1976) (Feerick). Madison recovered, however, and no legislation was passed nor were formal arrangements for the delegation or transfer of power implemented.

2. William Henry Harrison was inaugurated on March 4, 1841, and died of pneumonia on April 4, 1841. His illness was so short that the question of inability apparently did not arise.[3]

3. James A. Garfield was wounded on July 2, 1881, by an assassin and died 80 days later on September 19, 1881. Vice President Chester A. Arthur did not act in his stead. Arthur refused to do so because of a fear, shared by many constitutional scholars of the time, that once he had assumed the powers and duties of the office, they would "devolve on the Vice President" permanently, leaving him unable to turn the reins back to the President. U.S. Const., Art. II, § 1, cl. 6. *See* S. Rep.

---

[1] Material consulted included the N.Y. Times, S. Rep. No. 66, 89th Cong., 1st Sess. (1965), and hearings held in 1958. *Presidential Inability: Hearings on S.J. Res. 100, S.J. Res. 133, S.J. Res. 134, S.J. Res. 141, S.J. Res. 143, S.J Res. 144, S. 238, and S. 3113 Before the Subcomm. on Constitutional Amendments of the Senate Comm. on the Judiciary, 85th Cong., 2d Sess.* (1958) [hereinafter cited as *1958 Hearings*]. A list of articles on presidential inability can be found in the *1958 Hearings,* at 41-42.

[2] The first succession act was passed in 1792. Act of March 1, 1792, §§ 9-11, 1 Stat. 239. Unsuccessful efforts to change this statute occurred in 1820, 1856, and 1881.

[3] When Harrison died, Secretary of State Daniel Webster questioned whether the Constitution meant that Vice President John Tyler became "Acting President," rather than the President. Tyler disagreed and took the oath as President, thus establishing the "Tyler precedent" that the Vice President does succeed to the Office of the President when the prior occupant dies. *1958 Hearings* at 149.

The deaths of Zachary Taylor (July 9, 1850) and Abraham Lincoln (April 15, 1865) were apparently so swift that their Vice Presidents (Millard Fillmore, Andrew Johnson) assumed control without trouble. Feerick at 7-8.

No. 66, 89th Cong. 1st Sess. 6 (1965) (1965 Senate Report). Although the entire Cabinet believed Garfield to be unable to carry out his duties,[4] four of them, including the Attorney General, agreed with Arthur's analysis. Secretary of State James G. Blaine was in fact criticized for attempting to usurp presidential powers during Garfield's lengthy illness. *1958 Hearings* at 149–50.[5]

4. Grover Cleveland had two major operations for cancer of the mouth in July 1893. He told almost no one, including Vice President Adlai Stevenson. The two operations took place on a friend's yacht, with Cleveland unconscious and strapped to a chair propped against the mast. Feerick at 11–12. The complete secrecy was due to fears that the country might suffer an economic panic if it knew the President had cancer. The truth was apparently suppressed until 1917. Feerick at 12.[6]

5. William McKinley was wounded on Friday, September 6, 1901. He underwent emergency surgery and his doctors issued optimistic statements about his recovery. So positive was the outlook that Vice President Theodore Roosevelt and the Cabinet members who had gathered in Buffalo over the weekend began to disperse. M. Leech, In the Days of McKinley 598–99 (1959). "[T]he Vice-President was so firmly convinced that the emergency was over that he went to join his family at a camp in the Adirondacks, twelve miles from telegraph or telephone." *Id.* at 599. When McKinley began to fail, a guide was sent up into the mountains to fetch Roosevelt. Although he rushed back, Roosevelt arrived to take the oath of Office 12 hours after McKinley's death on September 14.

6. Woodrow Wilson was incapacitated from a stroke for about eight months of his second term. At no time did Vice President Thomas R. Marshall attempt to take over. *See 1958 Hearings* at 19. The hesitation was due to a fear that such action would be viewed as an effort to oust Wilson permanently. When he recovered, Wilson forced Secretary of State Lansing, who had called Cabinet meetings and suggested that Marshall take over as Acting President, to resign, charging him with disloyalty. *Id.*

7. Franklin Roosevelt was in declining health during his last year in office, and died on April 12, 1945. Vice President Harry S. Truman had had only two conversations with Roosevelt since the inauguration, neither dealing with disability. Feerick at 17. Perhaps as a reaction to this, Truman supported a new succession statute, Act of June 25, 1948, Pub. L. No. 80–771, 62 Stat. 672, 677–78 (1948).

---

[4] Garfield was able to conduct only one minor piece of business—the signing of an extradition paper Feerick at 9

[5] Arthur, who succeeded Garfield, suffered from an increasingly debilitating kidney disease while in office. Although he gradually reduced his schedule, he does not appear to have become completely incapacitated. Feerick at 10–11.

[6] It was the death of Cleveland's first Vice President, Thomas A. Hendricks, in 1885, while Congress was out of session, which accelerated passage of the Presidential Succession Act, Pub. L. No. 49-1, 24 Stat. 1 (1886)

8. Dwight D. Eisenhower suffered three major illnesses while in office—a heart attack (1955), ileitis (1956), and a "mild" stroke (1957). From the first, Vice President Richard Nixon consulted with the Cabinet and developed a procedure for relaying important matters to the President. A White House request for an opinion on the temporary delegation of presidential power was not acted upon because Attorney General Brownell felt there were sufficient legal arrangements in place to handle day-to-day operations.

Eisenhower was very troubled by the implications of the disability problem during each of his illnesses. He asked the Department of Justice to study the problem and recommend a solution, urged Congress to act, and entered into an informal agreement with Mr. Nixon. Feerick at 20–22. The agreement provided that:

> 1. In the event of inability the President would—if possible—so inform the Vice President, and the Vice President would serve as Acting President, exercising the powers and duties of the office until the inability had ended.
>
> 2. In the event of an inability which would prevent the President from so communicating with the Vice President, the Vice President, after such consultation as seems to him appropriate under the circumstances, would decide upon the devolution of the powers and duties of the office and would serve as Acting President until the inability had ended.
>
> 3. The President, in either event, would determine when the inability had ended and at that time would resume the full exercise of the powers and duties of the Office.

1965 Senate Report at 7.[7] Although Congress did hold hearings, no permanent action was taken.[8]

9. Lyndon B. Johnson was hospitalized four times, the first time being for a major bout with the flu (January 23–27, 1965).[9] In October 1965, Johnson was hospitalized for gall bladder surgery.[10] He was

---

[7] *See also* N.Y. Times, March 4, 1958, at 1, col. 2. Presidents Kennedy and Johnson entered into similar agreements with their Vice Presidents. 1965 Senate Report at 7. N.Y. Times, Jan. 28, 1965, at 13, col. 1. The Johnson-Humphrey agreement was identical to the Eisenhower-Nixon agreement. The Kennedy agreement differed only in that it urged the Vice President to consult with the Cabinet and the Attorney General "as a matter of wisdom and sound judgment." 1965 Senate Report at 7.

[8] *See 1958 Hearings, supra,* and *Hearings before the Special Subcommittee to Study Presidential Disability of the House Committee on the Judiciary,* 84th Cong., 2d Sess. (1956).

[9] At the time, Vice President Hubert H Humphrey stated that there had been discussions of when he would take over and a copy of the Johnson-Humphrey accord was made available to the press on January 28. *See* note 7, *supra,* and text.

[10] The accord was again noted by the press and columnist Arthur Krock urged the states to ratify the Twenty-Fifth Amendment.

anesthetized for three to four hours, after which Press Secretary Moyers announced that Johnson was again able to make presidential decisions. [11]

The same pattern was repeated in November 1967, when Johnson underwent simultaneous surgery for a polyp on his vocal cord and repair of a ventral hernia. He was anesthetized for about an hour and a half. Note was made of the agreement that could make Humphrey "Acting President" and columnist Tom Wicker urged that the Twenty-Fifth Amendment be ratified.

In December 1968, Johnson was again hospitalized for the flu. The papers, however, said little other than that he worked on government papers on one day of his stay.

10. Richard M. Nixon was hospitalized from July 12–20, 1973, for viral pneumonia. The President's press office said that he would be able to do necessary work and that he was not sick enough to require the Vice President to make special arrangements. In an interview, Vice President Spiro T. Agnew said that there was no agreement between the President and him on what to do in the event of Nixon's disability and that the issue had never been discussed.

Although there were persistent rumors about Nixon's health during the months prior to his resignation, the only White House announcement was an acknowledgment that the President suffered from phlebitis. The operation on his leg did not occur until September 23, 1974, after his resignation.

11. Jimmy Carter's scheduled surgery for hemorrhoids in late December 1978, was cancelled. Preparations for the Vice President to assume power under § 3 of the Twenty-Fifth Amendment were also cancelled.

LARRY L. SIMMS
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[11] Citing recent history, Johnson had urged Congress to act on the disability problem in his State of the Union address in January, 1965. The proposed Twenty-Fifth Amendment was sent to the states in July 1965.